## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal Action No. 2019-0018** |
| | ) | |
| **TROY SOMME, JR., and** | ) | |
| **ELIJAH RITTER,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ————————————————— | ) | |

**Attorneys:**
**Daniel H. Huston, Esq.,**
St. Croix, U.S.V.I.
  *For the United States*

**Martial A. Webster, Esq.,**
St. Croix, U.S.V.I.
  *For Defendant Troy Somme, Jr.*

**Pamela L. Colon, Esq.,**
St. Croix, U.S.V.I.
  *For Defendant Elijah Ritter*

## <u>MEMORANDUM OPINION</u>

**Lewis, District Judge**

  THIS MATTER comes before the Court on Defendant Elijah Ritter's ("Defendant Ritter") "Motion to Suppress Any and All Physical Evidence and Statements" (Dkt. No. 59), the Government's Opposition thereto (Dkt. No. 76), and Defendant Ritter's Reply (Dkt. No. 83); Defendant Troy Somme, Jr.'s ("Defendant Somme") "Motion to Suppress Any and All Physical Evidence and Statements" (Dkt. No. 71), and the Government's Opposition thereto (Dkt. No. 82); the parties' supplemental briefing (Dkt. Nos. 128, 133, 134, 143, 145, 146, 218, 229); and the evidence and arguments presented at the suppression hearing held on March 23-25, 2021, April

12, 2021, and August 13, 2021.[1] For the reasons that follow, the Court will grant both Defendants' Motions to Suppress.

## I.     BACKGROUND

On October 15, 2019, the Government filed an Indictment against both Defendants. (Dkt. No. 1). The Indictment charges Defendant Somme with: possession of an unregistered national firearms registration weapon in violation of 26 U.S.C. § 5861(d) (Count 1); possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) and (B) (Count 2); possession of marihuana with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) and 18 U.S.C. § 2 (Count 8); and maintaining a drug related premises in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2 (Count 9). The Indictment charges Defendant Ritter with: two counts of possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Counts 3 and 4); two counts of possession of ammunition by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Counts 5 and 6); possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) (Count 7); possession of marihuana with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) and 18 U.S.C. § 2 (Count 8); and maintaining a drug related premises in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2 (Count 9).

The Court held a suppression hearing on Defendants' Motions to Suppress on March 23-25, 2021 and April 12, 2021. The Court then ordered the parties to submit supplemental briefing.

---

[1] Both Defendants joined in each other's Motion to Suppress. (Dkt. Nos. 70, 73).

(Dkt. No. 120). Oral argument on Defendants' Motions to Suppress was then held on August 13, 2021.[2]

The instant Motions to Suppress stem from the execution of two federal search warrants—"the First Search Warrant" (Govt. Ex. 2) and "the Second Search Warrant" (Govt. Ex. 5)—on March 7, 2019 on the property where Defendants were residing. (Govt. Ex. 4 at 9). Prior to obtaining the First Search Warrant, law enforcement officers conducted warrantless aerial surveillance of the property on January 29, 2019 and February 6, 2019 in order to photograph the property. (Govt. Exs. 7, 8). The photographs taken during the aerial surveillance revealed an alleged marijuana cultivation operation taking place on the property and the photographs were used as a basis to apply for the First Search Warrant. (Govt. Ex. 1 at 4-8). Additionally, on January 31, 2019, a law enforcement officer performed warrantless surveillance of parts of the property from the ground level. *Id.* at 7.

The property at issue is a rural plot of land containing two buildings: "the Primary Residence" and "the Secondary Residence." (Govt. Ex. 1 at 12; *see also* Govt. Ex. 20). The Secondary Residence is a duplex which is divided into two units, referred to as 9A and 9B. 9B is on the western side of the duplex and sits closer to the public road and entrance to the driveway, whereas 9A is on the eastern side and is located closer to the Primary Residence. (Tr. Vol. II at 188, 190-191; Tr. Vol. III at 47, 78-79; Tr. Vol. IV at 169; Govt. Ex. 4 at 9).[3] Defendant Ritter

---

[2] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendants are presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but not conceded or proven beyond a reasonable doubt at this stage of the litigation.

[3] The property is owned by Reuben and Dariel Ruiz. (Govt. Ex. 1 at 2; Tr. Vol. I at 233-234). Marisol Ruiz—the mother of Defendant Somme—is the daughter of Dariel Ruiz. (Tr. Vol. II at 205-206; Tr. Vol. III at 22; Tr. Vol. IV at 153, 197). Defendant Somme is therefore the grandchild

resides in unit 9A of the duplex and Defendant Somme resides in unit 9B. (Tr. Vol. III at 6; Tr. Vol. IV at 169; Govt. Ex. 4 at 9). The driveway curves up from the public road to a small rectangular parking area. (Govt. Ex. 20). The Secondary Residence is the first structure seen as one enters the property from the driveway. *Id.* The side of the Secondary Residence runs parallel to the public road, and the front of the building—which includes an enclosed porch extending along the front of the structure—opens onto the rectangular parking area. *Id.* The Secondary Residence is on the western side of the property, and sits south of the Primary Residence. (Tr. Vol. I at 162, 223; Tr. Vol. II at 123). The Primary Residence sits perpendicular to the Secondary Residence, and the front of the building also opens onto the rectangular parking area and faces the direction of the public road. (Govt. Ex. 20). The Primary Residence runs in an east to west direction. (Tr. Vol. I at 162, 223). The alleged marijuana grow operation was located in the yard behind the Primary Residence. (Govt. Ex. 20). The entire property is surrounded by thick brush and trees. *Id.*

The First Search Warrant authorized the search of the Primary Residence and explicitly excluded the Secondary Residence. (Govt. Ex. 2 at 2-3). During the execution of the First Search Warrant, law enforcement discovered that no one was living in the Primary Residence. However, Defendants and others residing in the Secondary Residence were detained on the property for the duration of the search. Officers accompanied those detained individuals into the Secondary Residence several times so that the individuals could retrieve clothing and blankets, or use the restroom. Eventually, during the execution of the First Search Warrant, law enforcement conducted alleged "protective sweeps" of both units within the Secondary Residence. Defendants'

---

of the property owners and Defendants are also cousins. (Tr. Vol. III at 87; Tr. Vol. IV at 167, Govt. Ex. 4 at 3).

vehicles parked on the property—including Defendant Ritter's GMC truck and Defendant Somme's BMW—were searched under the authority of the First Search Warrant. (Tr. Vol. III at 142-149; *see also* Govt. Exs. 13, 16). Defendant Ritter made several statements to law enforcement on the scene. (Tr. Vol. IV at 64-66). Based on the evidence discovered on the property, law enforcement applied for the Second Search Warrant which authorized them to search the Secondary Residence. (Govt. Exs. 4, 5).

As a result of both searches, the Government seized numerous firearms, ammunition, approximately 160 marijuana plants, processed marijuana, cash, and drug paraphernalia. (Dkt. No. 76 at 1; Dkt. No. 82 at 1-2). Specifically, during the search of the Primary Residence, law enforcement discovered live marijuana plants and harvested plants hanging to dry. (Govt. Ex. 4 at 9). Additionally, two pistols were found in the center console of Defendant Ritter's truck. *Id.* Both Defendants were then arrested and taken to be interviewed.[4]

At the suppression hearing, the Government presented the testimony of several witnesses: Special Agent Edward Henderson; Task Force Officer David Wyrzykowski; Special Agent Michael Reed; Officer Gregory Bennerson; Special Agent William Medina; and Special Agent Kristian Olsen. In addition, Defendant Somme presented the testimony of one witness, Marisol Ruiz, who was present on the property during the execution of the search warrants.

---

[4] At the interview, Defendant Ritter invoked his right to counsel and was not given *Miranda* warnings. (Tr. Vol. IV at 83-84, 87). However, there was some small talk, and communication of basic information regarding where he was living, his family, occupation, and salary. *Id.* at 87-88. With regard to Defendant Somme, the Government stated at oral argument that while Defendant Somme was interviewed, there was nothing of evidentiary value gained during the interview. Thus, the Government stated that it would not seek to introduce any of Defendant Somme's statements.

### A.  Special Agent Edward Henderson

The Government's first witness was Special Agent Edward Henderson, a pilot assigned to the DEA's Aviation Division. (Tr. Vol. I at 5). He testified that on January 29, 2019, he was the pilot on a flight mission to conduct surveillance on St. Croix with Task Force Officer David Wyrzykowski operating as an observer. *Id.* at 15-18. On February 6, 2019, he flew over the same property with Special Agent Michael Reed acting as an observer. *Id.* at 20-21, 43, 46, 60-61.

Special Agent Henderson testified that while flying he monitors his altitude, his speed, the temperature, and the wind direction. *Id.* at 29. For safety purposes, his practice is to fly with at least a thousand-foot clearance over the highest object in the particular area. *Id.* at 31. Special Agent Henderson stated that the plane he flew had no gauge that tells him the altitude above the land surface he is immediately over. *Id.* at 30-31. In order to fly in compliance with his safety standards, he testified that:

> Depending on the location which I'm flying, I review our charts, the aeronautical charts, FAA charts, and in those charts it gives you, for example, it's called the maximum elevation figure. . . . And what that figure does is it tells you the highest point or highest obstacle or highest geographical location in a particular area. And from that, . . . I can judge the altitude that I'm going to fly.

*Id.* at 32.

Special Agent Henderson testified that on January 29, 2019 and February 6, 2019, he flew utilizing these standards. *Id.* at 33, 46, 88. The elevation of the highest obstacle in the area for the surveillance flights was 1,000 feet. *Id.* at 51.

When arriving at the place to be photographed, his practice is to conduct orbits around the location at a constant bank. *Id.* at 33-34. Additionally, he slows down to a low airspeed to allow the passenger observer to view the area. *Id.* at 44.

Special Agent Henderson testified that the altitude of the plane is recorded at the time of flight, but is not memorialized in any way. *Id.* at 52-53. He could not testify as to the lowest altitude at which he flew during the surveillance missions other than landing and taking off, and he could not recall the altitude at which he was flying when he circled the property. *Id.* at 53. He also could not recall whether there was any other air traffic while he circled the property. *Id.* at 63. Special Agent Henderson testified that he did not file an FAA flight plan, but was instead following visual flight rules permitted by the weather on January 29, 2019 and February 6, 2019. *Id.* at 63, 80-82. He stated that there were no restrictions on the airspace over the area he flew on both dates. *Id.* at 83.

### B.  Task Force Officer David Wyrzykowski

The Government's second witness was Task Force Officer David Wyrzykowski ("TFO Wyrzykowski") of the Virgin Islands Police Department ("VIPD") who was assigned to the High Intensity Drug Trafficking Area Task Force ("HIDTA"). (Tr. Vol. I at 102-103). TFO Wyrzykowski testified that he was assigned to do a flyover of St. Croix and take photographs of several residences on January 29, 2019. *Id.* at 104. He used his own Canon camera (a Canon, EOS 7D Mark II) with a 300mm telescopic lens with an automatic focus to take the photographs. *Id.* at 108-109, 145, 154. When he was photographing, he was only using the zoom capabilities of the lens, not the zoom capabilities of the camera itself. *Id.* at 149-150. TFO Wyrzykowski further stated that after returning to the office, he reviewed the photographs and was able to use his computer to zoom in and out on the photographs; however, his computer lacked the ability to enhance them. *Id.* at 112-113, 146-147. The photographs revealed evidence consistent with a marijuana grow operation on the property. *Id.* at 140-142.

### C.  Special Agent Michael Reed

The Government's third witness was Special Agent Michael Reed who is employed with the DEA and a member of the HIDTA team. (Tr. Vol. I at 176, 178). Special Agent Reed testified that he participated in the flyover on February 6, 2019 in order to photograph the property. *Id.* at 179. He stated that the goal of the second flyover was to confirm suspicions from the first flyover that the objects in the back of the house were potted marijuana plants, and to identify what appeared to be a water source and electrical source. *Id.* at 179, 181. To take the photographs, he used the Canon digital camera owned by TFO Wyrzykowski. (Tr. Vol. I at 182, 211; Tr. Vol. II at 12). He testified that he took the photographs of the property in both manual and automatic mode. (Tr. Vol. I at 214). He additionally used a 300mm lens with the camera. (Tr. Vol. I at 182; Tr. Vol. II at 13-14). In order to analyze the photographs, Special Agent Reed stated that he was able to upload the photographs to a computer and enlarge them. (Tr. Vol. II at 15-16).

Additionally, Special Agent Reed was the affiant for the application for the First Search Warrant. (Govt. Ex. 1; Tr. Vol. I at 192). He testified that he drafted the language for the affidavit in collaboration with Special Agent Kristian Olsen. (Tr. Vol. I at 191-192; Tr. Vol. II at 7-8). In preparing the application for the First Search Warrant, the address and plot number—9 Pleasant Valley—for the property was discovered through the use of websites including the Virgin Islands MapGeo and Google maps. (Tr. Vol. I at 197-198). Special Agent Reed testified that, based on his training and experience, there was probable cause to search the Primary Residence due to evidence of a marijuana grow operation, including: a suspected potting area with a potential electrical cord and potential water hose; suspected marijuana plants at different stages of maturity; and a suspected shipping container with an air conditioner unit, which is common in marijuana grow operations to use as a nursery. (Tr. Vol. I at 201; Tr. Vol. II at 96-98). However, he testified that

the Secondary Residence was excluded from the application for the First Search Warrant because there was not enough probable cause to search the residence. (Tr. Vol. I at 200, 225-226).

The application for the First Search Warrant asked for permission to search those vehicles "readily identified as being associated with individuals residing within the main structure." (Govt. Ex. 1 at 10; Tr. Vol. I at 223). Special Agent Reed testified that by "readily identifiable" he meant within the curtilage of the plot and associated with the individuals residing within the Primary Residence. (Tr. Vol. I at 223-224). In order to identify those vehicles associated with those particular individuals, Special Agent Olsen had previously conducted surveillance and gathered registration information of multiple vehicles on the property. *Id.* at 224.

### D. Officer Gregory Bennerson

The Government's fourth witness was Officer Gregory Bennerson of the VIPD. (Tr. Vol. II at 116-117). Officer Bennerson testified that he was assigned to assist with the execution of the federal search warrant on March 7, 2019. *Id.* at 118. He stated that the execution of the search warrant began around 6 a.m. when it was dark outside. *Id.* at 119, 167. Ten or more officers—who were all carrying weapons, including rifles—accompanied Officer Bennerson on the raid. *Id.* at 171-172. Law enforcement arrived on the scene in a convoy. *Id.* at 178. During the raid, he was assigned to the "perimeter" meaning he was providing cover for the outside of a structure. *Id.* at 118-119. Specifically, he was assigned to the southwestern corner of the Secondary Residence. *Id.* at 120-121. His vantage point from that position was looking at the back of the Secondary Residence as well as the side. *Id.* at 123-124. He observed four to five windows at the back of the duplex. *Id.* at 125. When he took his position, he heard the members of the entry team outside of the door of the Primary Residence announce "Police, Search Warrant" several times. *Id.* at 135-136, 138. Officer Bennerson testified that he then heard some noise and witnessed someone trying

to force an object out of the second window from his position. *Id.* at 125-126. He alerted Task Force Officer Moses President over the radio of what he had seen and illuminated the area with his flashlight, after which the individual moved away from the window. *Id.* at 126-127.

### E.  Special Agent William Medina

The Government's fifth witness was Special Agent William Medina with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). (Tr. Vol. II at 185). Special Agent Medina testified that he participated in the execution of the search warrants on March 7, 2019. *Id.* at 187. Special Agent Medina stationed himself outside of the Secondary Residence in front of 9B. *Id.* at 188, 190-191. He testified that his role was to ensure that if anyone came out of the Secondary Residence, they would not interfere with the execution of the warrant. *Id.* at 188. He stated that after the police knocked and announced, the occupants of the Secondary Residence began to come outside. (Tr. Vol. II at 191; Tr. Vol. III at 55). While Special Agent Medina testified that the officers did not initially direct the occupants of the Secondary Residence out of the house, he stated that once they began to come outside, he directed them to exit the residence so law enforcement could secure them somewhere nearby. (Tr. Vol. II at 191-192; Tr. Vol. III at 56, 118-119). Law enforcement then secured the occupants in a safe area, and handcuffed the men (Defendant Somme and Defendant Ritter), but not the women. (Tr. Vol. II at 192; Tr. Vol. III at 18, 106-107). He stated that some of the occupants exiting the Secondary Residence were "verbally combative" in that they shouted at the officers while they were being directed to come down off the porch. (Tr. Vol. II at 193-194). Other occupants were compliant and followed the directions of the officers. *Id.* at 193. Special Agent Medina further testified that he did not remember what was yelled but that any yelling lasted only for a minute or so. (Tr. Vol. II at 193-194; Tr. Vol. III at 60). He stated that the yelling stopped after the occupants of the duplex were directed off the porch into the secure

area and they complied with the officers' orders. (Tr. Vol. III at 60-61). Additionally, there was a

dog on the premises which was secured after officers ordered that it be secured. *Id.* at 40-41, 70-

71.

Special Agent Medina testified that approximately 20 minutes after securing the

individuals he entered the Secondary Residence. (Tr. Vol. II at 194; Tr. Vol. III at 61). One of the

female occupants requested to enter the Secondary Residence in order to get shirts for the other

occupants. (Tr. Vol. II at 194; Tr. Vol. III at 62). Special Agent Medina and a female police officer

(Detective Jules) entered 9B with the woman where she went to the room at the rear of the unit

and got T-shirts. (Tr. Vol. II at 195). Special Agent Medina testified that he smelled the odor of

marijuana immediately when he walked into the back room. *Id.* at 195-196. After he entered 9B,

he spoke with Special Agent Olsen who determined that a safety sweep of 9B was required. *Id.* at

197-198. Special Agent Medina participated in the safety sweep, and he testified that no other

individuals were found in the house. *Id.* at 198-199. He noted that there was a door that adjoined

the two sides of the duplex, which he closed and latched during the safety sweep. *Id.* at 199.

Additionally, during the safety sweep, he observed a pistol magazine on a shelf near the bathroom.

(Tr. Vol. II at 201; Tr. Vol. III at 103). Special Agent Medina testified that he went back into 9B,

when a marshal escorted Defendant Somme into 9B in order to use the restroom. (Tr. Vol. II at

203). While he was in 9B on this occasion, he observed a gun next to the pistol magazine he had

previously observed. (Tr. Vol. II at 204; Tr. Vol. III at 104).

Special Agent Medina further testified that another safety sweep was conducted on side 9A

of the Secondary Residence. He stated that there was a woman, Ms. Christian, seated inside 9A

near the door, who had an infant with her. (Tr. Vol. II at 201-202). He stated that he entered 9A at

the direction of Ms. Christian who requested a blanket. *Id.* at 202. However, Special Agent Medina

testified that Ms. Christian was not permitted to roam the house to retrieve the blanket herself. (Tr. Vol. III at 67). After he retrieved the blanket, a determination was made that a safety sweep of 9A should be conducted. (Tr. Vol. II at 201-203). No individuals were found during the safety sweep of 9A. *Id.* at 203.

Special Agent Medina also testified that he communicated with Marisol Ruiz, who identified herself as Defendant Somme's mother. (Tr. Vol. II at 205). Ms. Ruiz informed Special Agent Medina that her mother owns the property. *Id.* at 205-206. Special Agent Medina let her read the First Search Warrant and then gave her the warrant. *Id.* at 206, 214. Additionally, once he received a copy of the Second Search Warrant, he gave Ms. Ruiz a copy. *Id.* at 208, 215. Special Agent Medina did not provide Defendant Ritter with a copy of either search warrant. (Tr. Vol. III at 83). He stated that he gave Ms. Ruiz the warrant because she was the daughter of the owners of the property. *Id.* at 110.

Special Agent Medina additionally testified that he spoke briefly with Defendant Ritter during the raid. *Id.* at 4-5. While the First Search Warrant was being executed, he called Defendant Ritter over to speak. *Id.* at 5-6. At that point, Defendant Ritter was not handcuffed, and they were standing near the driveway outside of both buildings on the property. *Id.* Special Agent Medina testified that Defendant Ritter stated that he lived in 9A with Ms. Christian and their child. *Id.* at 6. Special Agent Medina then asked whether there were any guns or drugs in the house to which Defendant Ritter said no. *Id.* at 7. Special Agent Medina then asked whether Defendant Ritter owned any guns to which Defendant Ritter also said no. *Id.* at 8. When asked, Defendant Ritter refused to give Special Agent Medina his cellphone number. *Id.* at 7-8. A short while later, Special Agent Medina asked to speak with Defendant Ritter again, and Defendant Ritter declined. *Id.* at 8.

Special Agent Medina did not advise Defendant Ritter of his *Miranda* rights prior to speaking to him. *Id.* at 26.

Special Agent Medina testified that at least 14 law enforcement officers were present during the raid. *Id.* at 15, 62. The officers were outfitted in protective vests and were armed with weapons including pistols and rifles. *Id.* at 16-17. He testified that the entire episode lasted approximately six hours (6 a.m. to noon). *Id.* at 24.

### F.  Special Agent Kristian Olsen

The Government's final witness was the case agent, Special Agent Kristian Olsen of ATF. (Tr. Vol. III at 125).

Special Agent Olsen testified that he was involved in the decision to conduct the flyover of the property. *Id.* at 127. Although he did not participate in the flyovers, he reviewed the photographs taken on January 29, 2019 and February 6, 2019. *Id.* at 127-130. He testified that the photographs showed evidence of marijuana cultivation. *Id.* at 129. Additionally, he drove by the property on January 31, 2019 and was able to photograph a few vehicles in the parking area. (Tr. Vol. III at 130; ER Exs. 60-75). He testified that he did not physically enter onto the property to make those observations; instead, he was on the public roadway within his vehicle at the point where the driveway met the road. (Tr. Vol. III at 130, 188-189). He testified that these photographs were taken on his phone, an iPhone X. *Id.* at 185-186.

Special Agent Olsen stated that he participated in the drafting of the application for the First Search Warrant. *Id.* at 130-131. He located the address of the property from government records, using the Virgin Islands MapGeo, which is a GIS mapping system. *Id.* at 132.

Special Agent Olsen testified that the First Search Warrant was executed after 6 a.m. *Id.* at 136. During the execution of the search warrant, he was designated to do the knock and announce

on the Primary Residence. *Id.* He announced "Police; search warrant" multiple times while pounding on the front door of the Primary Residence. *Id.* No one answered the door; however, he gained entry through the door which was unlocked. *Id.* at 137. No individuals were in the Primary Residence and Special Agent Olsen testified that it appeared to be used for storage. *Id.* He further testified that there was an initial search done for individuals or things that could harm law enforcement, and after that was completed, a secondary search for evidence was conducted. *Id.* at 138. When he exited the Primary Residence and during the time law enforcement was conducting the secondary search, he heard yelling. *Id.* at 139. One woman—who Special Agent Olsen identified as Marisol Ruiz—was yelling that the police could not go into the house and was asking for a warrant. (Tr. Vol. III at 139; Tr. Vol. IV at 97-98, 117). He testified that he believes that other individuals were yelling, but they might have only been yelling at the woman to calm down. (Tr. Vol. III at 139; Tr. Vol. IV at 100). In addition to loudly yelling, Special Agent Olsen testified that Marisol Ruiz was walking towards law enforcement with her hands outstretched and pointing. (Tr. Vol. IV at 134).

Special Agent Olsen testified that law enforcement searched a BMW SUV located directly outside the front door of the Primary Residence. (Tr. Vol. III at 142-143; *see also* Govt. Exs. 13, 14). Additionally, a black GMC pickup truck was searched. (Tr. Vol. III at 146-148). At the time it was searched, the GMC truck was located across the parking area from the Primary Residence under a large tree. (Tr. Vol. III at 146-147; *see also* Govt. Exs. 16, 17). Special Agent Olsen stated that he believed he had the authority to search these vehicles pursuant to the First Search Warrant because they were immediately associated with the Primary Residence. (Tr. Vol. III at 149).

Special Agent Olsen testified that he ordered the protective sweep on 9B of the Secondary Residence. *Id.* at 156. He ordered the protective sweep because he learned that: an individual had

been observed trying to force something out a window; there was an individual yelling at officers; and there was a firearm magazine discovered in the secondary structure. *Id.* He stated that due to the presence of weapons, the close proximity of the Secondary Residence to officers, and the fact that they did not know who remained in the duplex, it was necessary to conduct a protective sweep. *Id.* at 156-157. He stated that the protective sweep of 9A was then done because of the presence of weapons and the common passageway between the two sides of the duplex. *Id.* at 157. The fact that the door between the two sides of the duplex had been locked did not alleviate his concern. *Id.* at 157-158. He testified that nobody was found in the sweep of side 9B. (Tr. Vol. III at 157; Tr. Vol. IV at 101). He did not participate directly in the sweep of 9A; however, he learned from other law enforcement agents that burnt and unburnt marijuana could be smelled throughout the residence. (Tr. Vol. IV at 138; *see also* Govt. Ex. 4 at 9).

Special Agent Olsen testified that there was a collective decision among the HIDTA officers and agents that the Secondary Residence should be excluded from the First Search Warrant. (Tr. Vol. III at 140). In deciding that a second search warrant was needed for the Secondary Residence, Special Agent Olsen testified that this determination was made because there was: a marijuana operation located immediately behind the Primary Residence; an attached seedling room or nursery facing the Secondary Residence; a power cord running through the grow to the Secondary Residence; and the evidence from the search of the vehicles including narcotics, narcotics packaging, trafficking paraphernalia, firearms, and accessories for firearms. *Id.* at 153-154. Additionally, once the protective sweep of 9B was completed, law enforcement also observed the smell of marijuana, a magazine and firearm, and a smoked marijuana cigarette. *Id.* at 154-155. Special Agent Olsen was the affiant for the application for the Second Search Warrant. (Tr. Vol. III at 160; Govt. Ex. 4). After the search warrant was obtained, Special Agent Olsen took the search

warrant to the property and executed it. (Tr. Vol. III at 165). Several firearms were discovered in 9A. (Tr. Vol. IV at 91-93; ER Ex. 14). Special Agent Olsen stated that he did not give Defendant Somme or Defendant Ritter a copy of either search warrant at the time the search warrants were executed; however, the search warrants were left at the property. (Tr. Vol. III at 169-170, 173).

Additionally, Special Agent Olsen testified that Defendant Ritter was asked if he had a firearm's license to which Defendant Ritter stated no, and Defendant Ritter also stated that he had just purchased his vehicle but had not registered it yet. (Tr. Vol. IV at 64-66). Defendant Ritter's statement regarding his lack of firearms license was included in the application for the Second Search Warrant. (Tr. Vol. IV at 77-78; Govt. Ex. 4 at 9).

Special Agent Olsen further testified that Defendant Ritter was arrested on the scene and law enforcement attempted to interview him; however, Defendant Ritter invoked his right to counsel. (Tr. Vol. IV at 83-84). Special Agent Olsen did not Mirandize Defendant Ritter, but according to Special Agent Olsen, there was discussion that was limited to small talk, and basic information regarding where Defendant Ritter was living, his family, occupation, and salary. *Id.* at 87-88.

**G. Marisol Ruiz**

The final witness, Marisol Ruiz, was proffered by Defendant Somme. Ms. Ruiz is Defendant Somme's mother and Defendant Ritter's aunt. (Tr. Vol. IV at 153, 167). She testified that she flew into St. Croix late on March 6, 2019, and on March 7, 2019, when the raid began, she was asleep in her son's house on the living room couch.[5] *Id.* at 154-155. Ms. Ruiz was awakened by flashlights, police screaming, and ordering her to exit the house. *Id.* at 155. From the

---

[5] Ms. Ruiz referred to the entire duplex as 9-A (Tr. Vol. IV at 168-169), in contrast to the Government's designation of one side of the duplex as 9A and the other as 9B.

living room, she saw a police officer with a flashlight and a gun pointed at her at a side window. *Id.* at 155-156. She testified that she also heard officers on the porch who were announcing themselves as police, telling the occupants to exit the home, and threatening to knock the door down. *Id.* at 156-157. Ms. Ruiz then left the house with the other occupants of the unit. *Id.* at 158. She testified that police were on the porch when they exited and when Defendant Somme came out of the house he was handcuffed as he stepped onto the porch. *Id.* at 159. Defendant Ritter was also handcuffed immediately when he exited the house. *Id.* at 160, 171-172. While law enforcement officers were conducting the search of the Primary Residence, Ms. Ruiz testified that she was outside and was told that she could not leave. *Id.* at 165. Ms. Ruiz stated that while the occupants of the Secondary Residence were being detained, they were kept in the parking lot between the Primary Residence and Secondary Residence, where there was no shade. *Id.* at 173. Ms. Ruiz testified that they were given no food, but were given a bottle of water. *Id.* at 166. Defendant Ritter's baby, who was only a few weeks old at the time, was present. *Id.* at 173. Officers were on the property until approximately 4 p.m. *Id.* at 165-166.

Ms. Ruiz further testified that she confronted one of the officers as she saw them going into the Primary Residence and she asked whether they had a warrant. *Id.* at 162. She testified that he swore at her and told her that he would give her the warrant when he was ready. *Id.* at 162-163. She testified that Special Agent Medina did give her the First Search Warrant. *Id.* at 163-164. Additionally, she saw the Second Search Warrant several hours later. *Id.* at 164.

Ms. Ruiz testified that when she arrived on the property the night before the execution of the search warrants, the door between the sides of the duplex was locked and was kept locked. *Id.* at 161-162, 167.

17

Finally, Ms. Ruiz testified that the property sits on top of a hill at an angle up from the roadway. *Id.* at 176. She stated that due to the bush cover and angle of the driveway, it is impossible to see the yard and front of the Primary Residence from the public roadway. *Id.* at 182-186.

## II.   DISCUSSION

As the first basis for their Motions to Suppress, both Defendants challenge the warrantless aerial surveillance of the property. The Court notes that there are many other challenges to the Government's actions asserted as bases for Defendants' Motions to Suppress, including: the ground-level surveillance of the property; the alleged illegal seizure of Defendants; the particularity of the First Search Warrant; the propriety of the protective sweeps of the Secondary Residence; the search of Defendants' vehicles; the search of both units within the Secondary Residence pursuant to the Second Search Warrant; and *Miranda* challenges to Defendants' statements. However, because the Court finds that the Motions to Suppress are resolved on the issue of the warrantless aerial surveillance, the Court need not reach the other arguments raised by the parties.

Regarding the warrantless aerial surveillance, Defendants argue that the Government conducted warrantless searches of their residences by taking aerial photographs of the property in which they had a reasonable expectation of privacy in violation of the Fourth Amendment. (Dkt. Nos. 59 at 9; 71 at 7). Defendants argue that this illegal search was then used to establish probable cause for the First Search Warrant and therefore the evidence obtained as a result of the First Search Warrant must be suppressed. (Dkt. Nos. 59 at 10; 71 at 7; 134 at 7, 11). Defendants further argue that all other evidence must be suppressed as fruit of the poisonous tree. (Dkt. Nos. 133 at 29; 134 at 11).

The Government argues that there was no Fourth Amendment violation in conducting the aerial surveillance because the surveillance was conducted at an altitude of at least 1,000 feet, which is navigable airspace from which Defendants did not have a reasonable expectation of privacy. (Dkt. Nos. 76 at 4; 82 at 4-5; 128 at 4). Because the 1,000 foot premise upon which the Government's argument is grounded is not sufficiently supported in the record, the Government's argument will be rejected.

### A. Applicable Legal Principles

The Fourth Amendment protects individuals from "unreasonable searches" in their homes. U.S. Const. amend. IV. "Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies." *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010) (citing *California v. Acevedo*, 500 U.S. 565, 580 (1991)). Evidence obtained as a result of an unreasonable search or seizure is inadmissible at trial and must be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963) (requiring exclusion and suppression of evidence obtained as a result of an unlawful search and seizure).

A search occurs when the government (1) physically intrudes on constitutionally protected areas or (2) invades an expectation of privacy that society recognizes as a reasonable expectation. *See Florida v. Jardines*, 569 U.S. 1, 5 (2013); *Kyllo v. United States*, 533 U.S. 27, 33 (2001). "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotation marks omitted). Further, courts "regard the area 'immediately surrounding and associated with the home'—what [] cases call the curtilage—as 'part of the home itself for Fourth Amendment purposes.'" *Jardines*, 569 U.S. at 6 (quoting *Oliver v. United States*, 466 U.S. 170,

180 (1984)); *accord Estate of Smith v. Marasco*, 318 F.3d 497, 518 (3d Cir. 2003) ("Fourth Amendment protections extend not only to a person's home, but also to the curtilage surrounding the property."). To constitute curtilage protected by the Fourth Amendment an area must "harbor[] the intimate activity associated with the sanctity of a man's home and the privacies of life." *United States v. Dunn*, 480 U.S. 294, 300 (1987) (internal citation and quotations omitted).

However, an area deemed within the curtilage does not itself bar all government activity. *California v. Ciraolo*, 476 U.S. 207, 213 (1986). "The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares. Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible." *Id*.; *see also Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.").

The Supreme Court has addressed aerial observation of property in the context of the Fourth Amendment. In *California v. Ciraolo*, 476 U.S. 207 (1986), the Supreme Court held that an aerial observation of a defendant's marijuana grow operation in his garden from an altitude of 1,000 feet where police took pictures with a standard camera did not violate the Fourth Amendment. The Court engaged in a two-part inquiry as articulated by Justice Harlan in his concurrence in *Katz v. United States*, 389 U.S. 347 (1967): "[F]irst, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" *Id.* at 211. In *Ciraolo*, the government did not dispute the finding of the lower court that the defendant met the first prong of the test. *Id.* As to this first prong, the Supreme Court commented:

> Clearly—and understandably—respondent has met the test of manifesting his own subjective intent and desire to maintain privacy as to his unlawful agricultural pursuits. . . . It can reasonably be assumed that the 10-foot fence was placed to conceal the marijuana crop from at least street-level views. So far as the normal sidewalk traffic was concerned, this fence served that purpose, because respondent "took normal precautions to maintain his privacy."

*Id.* (quoting *Rawlings v. Kentucky*, 448 U.S. 98, 105 (1980)). As to the second prong, the Court stated "that '[the] test of legitimacy is not whether the individual chooses to conceal assertedly "private" activity,' but instead 'whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment.'" *Id.* at 212 (quoting *Oliver*, 466 U.S. at 181-83). While the defendant manifested a subjective expectation of privacy, the Court found the expectation was not reasonable. *Id.* at 214. The Court reasoned that "[t]he observations . . . took place within public navigable airspace . . . in a physically nonintrusive manner . . . . Any member of the public flying in this airspace who glanced down could have seen everything that these officers observed." *Id.* at 213-14.

In *Dow Chem. Co. v. United States*, 476 U.S. 227 (1986), the Supreme Court held that the photographs of an industrial complex from navigable airspace using a "conventional, albeit precise, commercial camera commonly used in mapmaking" was not a violation of the Fourth Amendment. *Id.* at 238-39. The property here was more analogous to an open field than curtilage. *Id.* at 239. The Court noted that while the photographs "undoubtedly give EPA more detailed information than naked-eye views, they remain limited to an outline of the facility's buildings and equipment" and the photographs "are not so revealing of intimate details as to raise constitutional concerns." *Id.* at 238.

Finally, in *Florida v. Riley*, 488 U.S. 445 (1989), a plurality of the Supreme Court held that there was no Fourth Amendment violation when law enforcement viewed inside a partially open greenhouse from a helicopter flying at an altitude of 400 feet. The plurality found no reasonable

expectation of privacy in the greenhouse as the helicopter was flying at the altitude permitted by the law "and there is nothing in the record or before [the Court] to suggest that helicopters flying at 400 feet are sufficiently rare in this country to lend substance to respondent's claim that he reasonably anticipated that his greenhouse would not be subject to observation from that altitude." *Id.* at 451-52.

### B. Analysis

#### 1. Legality of Aerial Search

In this matter, the Government conducted two aerial surveillance missions over the property: one on January 29, 2019 and one on February 6, 2019. (Govt. Exs. 7, 8). On both missions, law enforcement observed the property where Defendants were residing and took photographs without a warrant.

In determining whether the warrantless aerial surveillance of Defendants' curtilage in this case violated the Fourth Amendment, the Court must ask "whether [Defendants have] a 'constitutionally protected reasonable expectation of privacy.'" *Ciraolo*, 476 U.S. at 211 (quoting *Katz*, 389 U.S. at 360 (Harlan, J., concurring)).[6] This is "a two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" *Id.* (citing *Smith v. Maryland*, 442

---

[6] The Court notes that the Government does not dispute that the marijuana plants were growing in the curtilage of Defendants' homes. *See Ciraolo*, 476 U.S. at 213 ("Accepting, as the State does, that this yard and its crop fall within the curtilage, the question remains whether naked-eye observation of the curtilage by police from an aircraft lawfully operating at an altitude of 1,000 feet violates an expectation of privacy that is reasonable."). Nor does the Government dispute that each Defendant had a Fourth Amendment interest in the area where the marijuana plants were photographed, notwithstanding that both Defendants and their families were residing on the property. *See United States v. Golson*, 743 F.3d 44, 55 n.9 (3d Cir. 2014) ("[S]tanding can be conceded by the government, and it is also subject to the ordinary rule that an argument not raised in the district court is waived on appeal." (quoting *United States v. Stearn*, 597 F.3d 540, 551 n.11 (3d Cir. 2010))).

U.S. 735, 740 (1979)); *see also Free Speech Coalition, Inc. v. Att'y Gen. of the United States*, 677 F.3d 519, 543 (3d Cir. 2012). Thus, the Court must first determine, under the analysis described in *Ciraolo*, whether Defendants manifested any subjective expectation of privacy from aerial surveillance of their property.

"The subjective prong requires a court to determine whether the defendant, by his conduct, has exhibited an actual expectation of privacy." *United States v. Cortez-Dutrieville*, 743 F.3d 881, 884 (3d Cir. 2014) (internal citation and quotation marks omitted); *see also Bond v. United States*, 529 U.S. 334, 338 (2000) ("First, we ask whether the individual, by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that 'he [sought] to preserve [something] as private.'" (quoting *Smith*, 442 U.S. at 740)). However, all that is required is that "the defendant . . . show that he 'took normal precautions to maintain his privacy.'" *United States v. Burnett*, 773 F.3d 122, 131 (3d Cir. 2014) (quoting *Rawlings*, 448 U.S. at 105); *see also United States v. Cardona-Sandoval*, 6 F.3d 15, 20-21 (1st Cir. 1993) ("To demonstrate a 'subjective expectation of privacy,' the Court has required little more than evidence that defendants made some minimal effort to protect their property or activities from warrantless intrusions.").

Defendants argue that "precautions to maintain privacy were taken" and reference "the heavy bush cover, the multiple buildings, and concealing mechanisms" on the property. (Dkt. No. 59 at 9, 20). At no point in the briefing submitted, does the Government argue that Defendants did not possess a subjective expectation of privacy in the area where the alleged marijuana plants were surveilled. Photographs of the property show that the property was in a secluded, rural area and was not surrounded by any other houses. (*See* Govt. Ex. 2 at 3; *see also id.* at 2 ("There are no residential properties immediately adjacent to 9 Pleasant Valley, Christiansted, USVI in any direction.")). Indeed, the First Search Warrant notes that the property "is on the east side of the

unnamed road commonly referred to as 'Solitude Road.'" *Id.* at 2. Additionally, the property was surrounded by heavy foliage on all sides, with the exception of the narrow strip of driveway. (Govt. Exs. 2 at 3; 20). Testimony from multiple witnesses revealed that the parking area and residences were located on the top of a hill, and much of the property including the front and back of the Primary Residence was not visible from the public road because of the upward angle of the driveway. (Tr. Vol. II at 75-76; Tr. Vol. IV at 52, 176-178).

In addition to the property being fully surrounded by thick foliage, photographs of the back of the Primary Residence, where the marijuana plants were found, also show that the area was surrounded on three sides—by a shed, a tarp canopy, and the rear of the Primary Residence. (Govt. Ex. 1 at 6). As the application for the First Search Warrant states, the property contained "[a] large white tarp canopy potentially utilized to provide shade to suspected marijuana plants, or provide concealment for plants from planes flying over the property." (Govt. Ex. 1 at 5; *see also* Tr. Vol. II at 98 (Agent Reed testified that "[t]he tarp could also and is often used to conceal plants from aerial observation."); Tr. Vol. IV at 46 (Special Agent Olsen testified that he believed the tarp was providing shade or used for concealing the marijuana plants)).

The Court concludes that the record adequately supports the conclusion that Defendants had a subjective expectation of privacy in their property where the marijuana plants were found. *See Ciraolo*, 476 U.S. at 211 (10-foot fence reflected that respondent "took normal precautions to maintain his privacy"); *State v. Davis*, 360 P.3d 1161, 1167 (N.M. 2015) ("affirmative steps to exhibit an expectation of privacy [reflected by] ground level 'fencing,' using a combination of vegetation and artificial devices"); *United States v. Cuevas-Sanchez*, 821 F.2d 248, 251 (5th Cir. 1987) (erection of fences around the backyard manifested a subjective expectation of privacy).

The fact that the marijuana plants were not fully shielded from aerial observation at the time the surveillance was conducted does not negate Defendants' subjective expectation of privacy. *See Riley*, 488 U.S. at 454 (O'Connor, J., concurring) ("[E]ven individuals who have taken effective precautions to ensure against ground-level observations cannot block off all conceivable aerial views of their outdoor patios and yards without entirely giving up their enjoyment of those areas. To require individuals to completely cover and enclose their curtilage is to demand more than the 'precautions customarily taken by those seeking privacy.'" (quoting *Rakas v. Illinois*, 439 U.S. 128, 152 (1978) (Powell, J., concurring))); *United States v. Ishmael*, 48 F.3d 850, 854-85 (5th Cir. 1995) ("Though the defendant in *Katz* did not take every precaution against electronic eavesdropping, the Court nonetheless concluded that he had exhibited a subjective expectation of privacy. . . . Though the Ishmaels did not—indeed, could not—take every precaution against the detection of the hydroponic laboratory, the balance of the evidence demonstrates that the Ishmaels exhibited a subjective expectation of privacy."); *State v. Quiday*, 405 P.3d 552, 558 (Haw. 2017) (in analyzing the two-prong test under the Hawaii Constitution "[w]e believe that Quiday exhibited an actual, subjective expectation of privacy in his backyard where the marijuana plants were located. Quiday's placement of the plants in his backyard, the activities in which were not capable of observation by members of the public at ground-level, was 'indicative of [his] subjective intent to avoid the public gaze' into the curtilage of his home." (quoting *State v. Kaaheena*, 575 P.2d 462, 467 (Haw. 1978))).

The Court must next determine whether Defendants' subjective expectation of privacy is one society is willing to recognize as reasonable. *Ciraolo*, 476 U.S. at 211; *United States v. Broadhurst*, 805 F.2d 849, 854 (9th Cir. 1986) ("Should we determine that defendants' subjective expectation was one which society is prepared to recognize as reasonable, then the state's circling

overflights rise to the level of a 'search' which, because it lacked a warrant in this case, violated the Fourth Amendment."); *Cortez-Dutrieville*, 743 F.3d at 884 ("The objective prong requires a court to determine whether the defendant's 'expectation of privacy is one that society is prepared to recognize as reasonable.'" (quoting *United States v. Correa*, 653 F.3d 187, 190 (3d Cir. 2011))).

Even if Defendants believed themselves to be shielding their gardening exploits from members of the public, "the mere fact that an individual has taken measures to restrict some views of his activities [does not] preclude an officer's observations from a public vantage point where *he has a right to be and which renders the activities clearly visible*." *Ciraolo*, 476 U.S. at 213 (emphasis added). For purposes of aerial surveillance, courts have emphasized that law enforcement officers have a right to be in public navigable airspace. *Ciraolo*, 476 U.S. at 213-214 ("The observations by Officers Shutz and Rodriguez in this case took place within public navigable airspace . . . in a physically nonintrusive manner; from this point they were able to observe plants readily discernible to the naked eye as marijuana. . . . On this record, we readily conclude that respondent's expectation that his garden was protected from such observation is unreasonable and is not an expectation that society is prepared to honor."); *Riley*, 488 U.S. at 450 ("Riley could not reasonably have expected the contents of his greenhouse to be immune from examination by an officer seated in a fixed-wing aircraft flying in navigable airspace . . . ."); *see also United States v. Warford*, 439 F.3d 836, 843 (8th Cir. 2006) ("Aerial surveillance of even the curtilage of a home from publicly navigable airspace, at an altitude generally used by the public and conducted with the naked eye, is not a 'search' within the meaning of the Fourth Amendment, because there is no reasonable expectation of privacy in areas visible to the public."); *United States v. Boyster*, 436 F.3d 986, 992 (8th Cir. 2005) ("So long as the aerial surveillance took place in an area where the public could legally fly and at an altitude generally used by the public, there would be no

reasonable expectation of privacy and thus no offense to the Fourth Amendment."); *Broadhurst*, 805 F.2d at 855 ("[T]hey knowingly exposed the translucent sides of their greenhouse to those who might view it from public navigable airspace."). Thus, in order for the warrantless aerial surveillance in this matter to be permissible, the Court must assure *at least* that the photographs were taken from an altitude the aircraft had a legal right to be.[7]

The Government's witness, Special Agent Henderson, was the pilot who flew the surveillance missions on both January 29, 2019 and February 6, 2019. (Tr. Vol. I at 15-18, 20-21, 43, 60-61). Special Agent Henderson testified that for safety purposes, as a practice, he flies with at least a thousand-foot clearance over the highest object in the particular area and on both surveillance missions he utilized this safety standard. *Id.* at 31, 33, 46, 87-88. He further testified that based on the charts of the area he reviewed, the elevation of the highest object in the area was 1,000 feet. *Id.* at 51. Significantly, however, Special Agent Henderson's testimony did not withstand cross examination, during which he testified that he *did not know* the altitude at which he flew when flying over the property:

> Q So, what is it other than landing and take off, what was the lowest altitude you flew at that flight?
> A Other than to take off and landing, I couldn't tell you.
> Q And what was the altitude that you were flying at when you were over the site that you circled?
> A The altitude, I don't recall.

---

[7] The fact that law enforcement officers are in public navigable airspace is not the only factor of relevance in determining the legality of aerial surveillance under the Fourth Amendment. *See Riley*, 488 U.S. at 454 (O'Connor, J. concurring) ("The fact that a helicopter could conceivably observe the curtilage at virtually any altitude or angle, without violating FAA regulations, does not in itself mean that an individual has no reasonable expectation of privacy from such observation."). Indeed, other flight-related issues, including the regularity of air travel in the area and the use of cameras with telescopic lenses, also bear on the issue of an individual's reasonable expectation of privacy.

*Id.* at 53. Additionally, the altitude at which he flew was not memorialized in any way. *Id.* at 52-53, 62.[8]

Defendant Ritter argues that the search was invalid because the Government did not produce any evidence regarding the actual altitude flown over the property. (Dkt. No. 133 at 28). The Government argues that the testimony that Special Agent Henderson was flying in compliance with his safety protocol of at least a 1,000 foot clearance over the highest object in that particular area is sufficient to show that the aerial surveillance was conducted within navigable airspace. (Dkt. No. 128 at 4).

The parties here agree—as stated at oral argument—that the burden in this case is on the Government to establish that it was flying within navigable airspace.[9] While the Court acknowledges that Special Agent Henderson stated that he flew consistent with his safety standards while conducting both aerial surveillance missions, the Court must reconcile such a statement with his explicit testimony on cross-examination that he does not know at what altitude he was flying when he flew over the property, nor does he know the lowest altitude at which he flew. The Government has also failed to maintain any records reflecting the altitude of the aerial surveillance.

Accordingly, the Court finds that because there is an absence of evidence from the Government demonstrating that the aircraft was in public navigable airspace[10] at the critical time—

---

[8] The Government recognized in its briefing and at oral argument that there is a lack of testimony establishing the altitude of the aerial surveillance. (*See* Dkt. No. 128 at 2-3 ("SA Pilot Henderson did not recall the specific altitude that he flew on those dates, nor was it memorialized.")).

[9] The Government is, of course, the party with the greater—if not sole—access to such flight-related information as the altitude at which the aircraft was flying.

[10] Navigable airspace is defined as "airspace above the minimum altitudes of flight prescribed by [FAA regulations]." 49 U.S.C. § 40102(a)(32). Special Agent Henderson did not testify as to which—if any—FAA regulations he was flying pursuant to. The parties also disagree about the

when it was flying over Defendants' property—there is no evidence that the surveillance was properly conducted from "a public vantage point where [the law enforcement officers] ha[d] a right to be." *Ciraolo*, 476 U.S. at 213. Thus, the Court concludes under the Supreme Court's direction in *Ciraolo*, *Riley*, and *Dow*, that the aerial surveillance conducted in this matter constituted an impermissible warrantless search of Defendants' curtilage under the Fourth Amendment. *Cf. Riley*, 488 U.S. at 451 ("Any member of the public could legally have been flying over Riley's property in a helicopter at the altitude of 400 feet and could have observed Riley's greenhouse. The police officer did no more."); *United States v. Breza*, 308 F.3d 430, 434-35 (4th Cir. 2002) ("The district court . . . found that the helicopter fully complied with applicable regulations regarding proper altitude. Additionally, testimony from law enforcement officers established that such flights were a regular occurrence in the area where Breza's farm was located. We therefore conclude that the aerial observation of Breza's property did not violate his Fourth Amendment rights."); *United States v. Randolph*, __F. Supp. 3d__, Criminal Action No. 3:20-00150, 2022 WL 710183, at *4 (S.D.W. Va. Mar. 9, 2022) ("In considering the defendant's Fourth Amendment argument, the Court finds that the helicopter was at 500 feet above ground level and within FAA regulations at the time the marijuana was observed. Thus, any member of the public who was flying within navigable airspace could have observed the plants within the curtilage of the mobile home, and Lt. Zerkle's plain-view observation of the plants was not a search within the meaning of the Fourth Amendment.").[11]

---

applicable FAA regulations. (Dkt. Nos. 82 at 4; 128 at 4-5; 83 at 3; 133 at 27). However, for the reasons described herein, the Court need not determine what FAA regulations are applicable.

[11] Because the Court resolves the issue of the constitutionality of the aerial surveillance on this issue of the altitude of the airplane, the Court need not address the parties' other flight-related arguments, including the regularity of flights in the area or the use of a camera with a telescopic lens.

## 2. Suppression of Evidence

Because the Court has concluded that there was a violation of the Fourth Amendment in the Government's collection of photographs, the Court must next determine whether any evidence must be suppressed.

"[W]hen the Government seeks to admit evidence collected pursuant to an illegal search or seizure, the judicially created doctrine known as the exclusionary rule at times suppresses that evidence and makes it unavailable at trial." *United States v. Katzin*, 769 F.3d 163, 169 (3d Cir. 2014) (en banc) (citing *Herring v. United States*, 555 U.S. 135, 139 (2009)). "Whether to suppress evidence under the exclusionary rule is a separate question from whether the Government has violated an individual's Fourth Amendment rights." *Id.* at 170 (citing *Hudson v. Michigan*, 547 U.S. 586, 591-92 (2006)).

"[T]he independent source doctrine serves as an exception to the exclusionary rule and permits the introduction of evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality." *United States v. Stabile*, 633 F.3d 219, 243 (3d Cir. 2011) (quoting *United States v. Price*, 558 F.3d 270, 281 (3d Cir. 2009)) (internal quotation marks omitted). Under the independent source doctrine, the Third Circuit has found that "even assuming that some factual averments in the affidavit are tainted, they do not vitiate a warrant which is otherwise validly issued upon probable cause reflected in the affidavit." *United States v. Johnson*, 690 F.2d 60, 63 (3d Cir. 1982); *see also United States v. Herrold*, 962 F.2d 1131, 1138-43 (3d Cir. 1992) (following *Johnson*); *United States v. Deaner*, 1 F.3d 192, 197 (3d Cir. 1993) ("Because the affidavit establishes probable cause without the evidence obtained by such device, we express no opinion on whether the use of a FLIR

[forward-looking infra-red] device in aerial surveillance of a residence is a search within the meaning of the Fourth Amendment.").

Under the independent source doctrine, the Court must ask two questions, "(1) whether a neutral justice would have issued the search warrant even if not presented with information that had been obtained during an unlawful search and (2) whether the first search prompted the officers to obtain the search warrant." *Herrold*, 962 F.2d at 1144; *Stabile*, 633 F.3d at 243; *United States v. Perez*, 280 F.3d 318, 339 (3d Cir. 2002); *United States v. Price*, 558 F.3d 270, 281 (3d Cir. 2009); *United States v. Combs*, 727 F. App'x 744, 747 (3d Cir. 2018). "If the answers to these questions are yes and no respectively, . . . then the evidence seized during the warranted search . . . is admissible." *Herrold*, 962 F.2d at 1144. To conclude that an application for a search warrant is supported by probable cause, the test is simply whether "there is a 'fair probability that . . . evidence of a crime will be found in a particular place.'" *United States v. Zimmerman*, 277 F.3d 426, 432 (3d Cir. 2002) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

In this case, the photographs taken during the aerial surveillance on January 29, 2019 and February 6, 2019 were used to apply for the First Search Warrant. (Govt. Ex. 1).[12] The application for the First Search Warrant contained the following facts to support a search: 1. A list of Defendant Somme's prior arrests including for firearms violations and an ongoing controlled substance investigation; 2. A description of two police encounters of the other suspected resident of the property, Malachi Maccow, including an unknown sealed juvenile offense and a traffic stop in 2010 where firearms were recovered, but he was not charged; 3. In February 2017, Defendant

---

[12] A photograph that TFO Wyrzykowski took on January 29, 2019 was used in the application for the First Search Warrant. (Tr. Vol. I at 140-141; Govt. Ex. 1 at 6; Govt. Ex. 19). A photograph that Special Agent Reed took on February 6, 2019 was also used in the application for the First Search Warrant. (Tr. Vol. I at 190; Govt. Ex. 1 at 8; Govt. Ex. 20).

Somme was involved in a traffic stop where police discovered marijuana packaged for sale, a pistol, a digital scale, and $2,299 in U.S. currency; 4. On January 31, 2019, law enforcement conducted ground-level surveillance of the property and observed multiple vehicles; and 5. Photographs and descriptions of the alleged marijuana grow operation behind the Primary Residence obtained during the warrantless aerial surveillance that occurred on January 29, 2019 and February 6, 2019. (Govt. Ex. 1).

It is clear that the First Search Warrant lacks probable cause without the aerial photographs taken showing plants, pots, and other materials used in marijuana cultivation. It is true that in the Third Circuit, "direct evidence linking the residence to criminal activity is not required to establish probable cause. . . . Instead, probable cause to search can be based on an accumulation of circumstantial evidence that together indicates a fair probability of the presence of contraband at the home of the arrested." *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002) (internal citations omitted). However, a list of Defendant Somme's and Malachi Maccow's prior interactions with law enforcement and a description of vehicles located on the property constitute insufficient facts to establish probable cause of criminal activity to search the property or the Primary Residence.[13] Additionally, the First Search Warrant was clearly grounded in the aerial surveillance which showed the alleged marijuana grow operation on the property. Indeed, the Government acknowledged at oral argument that, without the information discovered during the aerial surveillance, the First Search Warrant lacks probable cause. Thus, the Court concludes that

---

[13] The Court notes that Defendant Somme argues that Agent Olsen lied on the Application for the First Search Warrant which stated that Defendant Somme had a prior felony conviction. (Dkt. No. 134 at 18). Special Agent Olsen testified at the hearing that he reported that there was a conviction on file in 2014 for constructive possession of a firearm because the N.C.I.C. database reflected that conviction. (Tr. Vol. IV at 112-113). However, the Court need not address this issue given that the Court has found that the First Search Warrant lacks probable cause after the aerial surveillance data is excised from the warrant application.

the independent source doctrine does not apply to the evidence collected as a result of the First

Search Warrant. *See Stabile*, 633 F.3d at 243.

In light of the fact that probable cause for the First Search Warrant was dependent on

evidence obtained from the illegal aerial surveillance, the First Search Warrant is invalid and the

evidence obtained therefrom must be suppressed, including the marijuana plants, processed

marijuana and drug paraphernalia associated with the grow operation discovered in the Primary

Residence, as well as the firearms and ammunition discovered in the Secondary Residence and in

Defendant Ritter's truck. *See, e.g.*, *United States v. Smith*, 575 F. Supp. 3d 542, 557 (E.D. Pa.

2021) (suppressing DNA evidence where the warrant used to collect DNA evidence was

"prompted" by prior unlawful search).

The illegal search resulting from the First Search Warrant has a domino effect on the

Second Search Warrant under the fruit of the poisonous tree doctrine. *See Burton*, 288 F.3d at 99

("[T]he exclusionary rule is determined by 'whether, granting establishment of the primary

illegality, the evidence to which . . . objection is made has been come at by exploitation of that

illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'"

(quoting *Wong Sun*, 371 U.S. at 488)). Here, Special Agent Olsen's testimony clearly reveals that

law enforcement sought the Second Search Warrant based on the evidence obtained and

observations made during the execution of the First Search Warrant, including: the marijuana grow

operation located immediately behind the Primary Residence; an attached seedling room or

nursery facing the Secondary Residence; a power cord running through the grow to the Secondary

Residence; and the evidence from the search of the vehicles including narcotics, narcotics

packaging, trafficking paraphernalia, firearms, and accessories for firearms. (Tr. Vol. III at 153-

154). Moreover, once law enforcement was on the property to execute the First Search Warrant,

this prompted law enforcement to detain Defendants and their families on the property and perform alleged protective sweeps of their residences. Special Agent Olsen further testified that the observations made during the protective sweeps of both units in the Secondary Residence— specifically the odor of marijuana, a firearm, a magazine, and a smoked marijuana cigarette—led law enforcement to seek the Second Search Warrant, which authorized a search of the Secondary Residence. (Tr. Vol. III at 154-155). Further, while Defendant Ritter was detained, he made statements to law enforcement, which were used in the application for the Second Search Warrant. (Govt. Ex. 4 at 9). The execution of the Second Search Warrant then led to the discovery of evidence including several firearms in the Secondary Residence. (Tr. Vol. IV at 91-93; ER Ex. 14). Finally, after the execution of the Second Search Warrant, Defendants were arrested without a warrant and taken for questioning.

The Government does not argue that any other exception to the exclusionary rule should apply in this matter that would purge the taint of the unconstitutional search from the evidence and statements collected during the execution of both search warrants. Indeed, at oral argument, the Government conceded that if the Court found that the aerial surveillance and the evidence obtained therefrom violated the Fourth Amendment, such a finding would be dispositive of the entire matter. The Court agrees—and as discussed above—has so found. Thus, the Court will suppress all evidence obtained and statements made by Defendants on March 7, 2019 as fruit of the poisonous tree. *See Herrold*, 962 F.2d at 1137 ("[The fruit of the poisonous tree] doctrine requires the exclusion of tangible evidence seized during an unlawful search, and derivative evidence, both tangible and testimonial, acquired as a result of the unlawful search."); *United States v. St. Rose*, 189 F. Supp. 3d 528, 550 (D.V.I. 2016) (suppressing evidence where "the record contains no

evidence of intervening circumstances that would have purged the taint from the involuntary statement").

### III.   CONCLUSION

For the reasons discussed above, the Court will grant the Motions to Suppress filed by Defendant Ritter and Defendant Somme.

An appropriate Order accompanies this Memorandum Opinion.

Date:   September 20, 2022                    _____/s/_____
                                             WILMA A. LEWIS
                                             District Judge